|  |  |
|---|---|
| DELANO CONNOLLY,<br><br>          Plaintiff,<br><br>      v.<br><br>NEW YORK CITY ADMINISTRATION FOR CHILDREN SERVICES, CITY OF NEW YORK, TERRELL EVANS, JAMES KEYS, ORAN NEMBHARD, MYRA GARCIA, and SIHEEM ROSEBOROUGH in their individual and professional capacities,<br><br>          Defendants. | Civil Action No.: 24-cv-5507<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Delano Connolly ("Connolly" or "Plaintiff") by and through his attorneys, Crabill PLLC, hereby alleges as follows against Defendants New York City Administration for Children Services ("ACS" or the "Agency"), the City of New York (the "City"), Terrell Evans ("Evans"), James Keys ("Keys"), Oran Nembhard ("Nembhard"), Myra Garcia ("Garcia"), and Siheem Roseborough ("Roseborough") (altogether, "Defendants"):

## PRELIMINARY STATEMENT

1. For over 25 years, Connolly has dedicated his career to serving and protecting the children and families of New York City through his work as attorney at ACS.

2. Despite Connolly's hard work and devotion, ACS has waged a deplorable campaign of discrimination and retaliation against Connolly simply because he suffers from disabilities, requires and requested reasonable accommodations, and had the courage to challenge Defendants' unlawful treatment of him.

3. For years, Connolly excelled working with reasonable accommodations which allowed him to manage pain and other complications related to disabilities.

4.    However, ACS callously and abruptly rescinded his accommodations without any justification or explanation while he was out on medical leave.

5.    ACS's rescission of Connolly's accommodations coincided with the Agency's hiring of James Keys as its Equal Employment Opportunity ("EEO") Officer.

6.    Under Keys' leadership, ACS not only stripped Connolly of his previously approved accommodations, but the Agency refused to engage in any interactive process with Connolly to discover accommodations that would allow him to perform the essential functions of his job.

7.    Also, ACS forced Connolly to remain out on medical leave following heart surgery until he could guarantee he no longer required any accommodations.

8.    In other words, ACS refused to continue to employ Connolly as long as he continued to suffer from disabilities.

9.    When ACS's internal procedures failed to remedy ACS's discriminatory decision to rescind his accommodations, Connolly was forced to challenge ACS's decision in an action in New York State Supreme Court.

10.    To punish him for filing the State Court Action[1] and engaging in other protected activities and in furtherance of its discriminatory treatment of him, ACS refused to allow Connolly to return from medical leave even after his doctors permitted him to return without accommodations.

11.    Instead, ACS forced Connolly to remain out on leave in an attempt to generate a pretextual justification for ending his employment via N.Y. Civ. Serv. Law § 73, which permits

---

[1] The term "State Court Action" is defined *infra* at ¶ 184.

termination of a civil service employee who has been "continuously absent from and unable to perform the duties of his position for one year or more by reason of a disability[.]"

12.     However, in the State Court Action, the court granted injunctive relief prohibited ACS from terminating Connolly's employment pending the court's review the Agency's decision to rescind his accommodations.

13.     Immediately after Connolly returned to work following their failed attempt to end his employment, Connolly's supervisors pressured him to resign in an effort to frustrate the injunctive relief awarded in the State Court Action.

14.     Connolly refused to resign and continues to advocate for families of New York City as an ACS Attorney.

15.     Still, ACS continues to discriminate and retaliate against Connolly hoping they will be able to force him to quit.

16.     Connolly's return to work following ACS forcing him out on mandatory medical leave caused the symptoms of Connolly's disabilities flare up and his doctor's recommended that ACS provide him with an accommodation to work remotely two days per week.

17.     Consistent with its discriminatory and retaliatory treatment of him, ACS denied Connolly's request and refused to provide any explanation or justification for their decision.

18.     Incredibly, at the same time ACS denied Connolly's accommodation request, the Agency had agreed with Connolly's union to provide and was in the process of launching a hybrid work program allowing employees to work remotely two days per week, the exact relief ACS denied Connolly.

19.     Clearly, ACS's denial of Connolly's request for a remote work accommodation had nothing to with him supposedly not being able to perform the essential functions of his job or some undue hardship on the Agency.

20.     Rather, ACS's conduct against Connolly has been motivated by an obvious discriminatory and retaliatory animus because Connolly suffers from disabilities, requires accommodations, and engaged in protected activities.

21.     Tellingly, after Keys departed from the ACS and new EEO leadership took over, ACS approved a subsequent request for accommodations by Connolly virtually identical to the accommodations ACS previously tore away from and denied Connolly.

22.     The discrimination and retaliation that Defendants committed against Connolly violates, *inter alia*, the American with Disabilities Act, 42 U.S.C.A. § 12101, *et seq.* ("ADA"), New York State Human Rights Law, N.Y. Exec. Law §§ 290, *et seq.* ("NYSHRL") and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101, *et seq.* ("NYCHRL").

## JURISDICTION AND VENUE

23.     Pursuant to 28 U.S.C. §§ 1331, this Court has subject matter jurisdiction over this action because it involves federal questions regarding the deprivation of Plaintiff's rights under the ADA.

24.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiff's related claims arising under State and City law.

25.     Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this District.

## ADMINISTRATIVE PREREQUISITES

26.     On December 23, 2023, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging, *inter alia*, discrimination and retaliation in violation of ADA.

27.     Plaintiff received a Notice of Right to Sue from the EEOC on May 9, 2024.

28.     Fewer than 90 days have passed since Plaintiff received his Notice of Right to Sue.

## PARTIES

**A.      Plaintiff Delano Connolly**

29.     Plaintiff is a resident of the City of New York.

30.     Plaintiff has been employed by Defendants from in or around 1998 through the present.

**A.      Defendants Administration for Children's Services**

31.     ACS is a New York City government agency that protects and promotes the safety and well-being of New York City's children and families by providing child protective services through social services referrals and litigation, as well as welfare, juvenile justice, and early care and education services.

32.     ACS maintains offices at 150 William Street, New York, New York 10038 and 330 Jay Street, Brooklyn, New York 11201, out of which Plaintiff has worked throughout most of his employment.

33.     At all relevant times, ACS controlled and directed the terms and conditions of Plaintiff's employment, including, *inter alia*, the provision, denial, and rescission of reasonable accommodations.

34.     At all relevant times, the ACS was an "employer" within the meaning of all relevant statutes and regulations.

**B.      Defendant City of New York**

35.     The City is a municipal corporation that controls and oversees, *inter alia*, the operations of ACS.

36.     At all relevant times, the City controlled and directed the terms and conditions of Plaintiff's employment, including, *inter alia*, the provision, denial, and rescission of reasonable accommodations.

37.     At all relevant times, the City was an "employer" within the meaning of all relevant statutes and regulations.

**B.      Defendant Terrell Evans**

38.     Defendant Terrell Evans is, upon information and belief, a resident of the State of New York.

39.     Evans supervises Plaintiff's employment with ACS.

40.     At all relevant times, Evans was Plaintiff's "employer" and/or "person" within the meaning of all relevant statutes and regulations.

**C.      Defendant James Keys**

41.     Defendant James Keys is, upon information and belief, a resident of the State of New York.

42.     Keys supervised Plaintiff's employment with ACS.

43.     At all relevant times, Keys was Plaintiff's "employer" and/or "person" within the meaning of all relevant statutes and regulations.

**D.**    **Defendant Oran Nembhard**

44.    Defendant Oran Nembhard is, upon information and belief, a resident of the State of New York.

45.    Nembhard supervises Plaintiff's employment with ACS.

46.    At all relevant times, Nembhard was Plaintiff's "employer" and/or "person" within the meaning of all relevant statutes and regulations.

**E.**    **Defendant Myra Garcia**

47.    Defendant Myra Garcia is, upon information and belief, a resident of the State of New York.

48.    At all relevant times, Garcia was a "person" within the meaning of all relevant statutes and regulations.

**F.**    **Defendant Siheem Roseborough**

49.    Defendant Siheem Roseborough is, upon information and belief, a resident of the State of New York.

50.    At all relevant times, Roesborough was a "person" within the meaning of all relevant statutes and regulations.

## FACTS

**A.**    **Background**

51.    Connolly is a Level III Agency Attorney in ACS's Family Court Legal Services Unit ("FCLS").

52.    Connolly has worked at ACS for over 25 years, and has moved up within the Agency as a result of his exceptional work.

53.    Specifically, Connolly began his career at ACS as an Agency Attorney Intern.

54.     Thereafter, he was promoted to Agency Attorney Level I before being promoted to Agency Attorney Level III—skipping Agency Attorney Level II entirely.

55.     Connolly has also served as a Team Leader at various points during his time at ACS, in addition to training other Agency Attorneys and drafting training materials for ACS.

56.     Moreover, with the exception of one performance review (for which he was rated "Good"), Connolly was rated "Very Good" in every single performance review he received over the course of more than two decades at ACS.

**B.      Connolly's Back, Shoulder, Knee, Elbow, and Hip Injuries, and Resulting Disabilities**

57.     In or around January 2018, Connolly sustained a fall at work resulting in injuries to his back, right shoulder, right and left knees, right and left elbows, and right hip.

58.     Specifically, Connolly suffered a disc bulge with anterior thecal sac impingement, paracentral foraminal herniation, lateral recess impingement, a tear in his left knee meniscus, a slap tear in his right shoulder, and a tear of the right acetabular labrum, among other injuries.

59.     Connolly's back, shoulder, knee, elbow, and hip injuries resulting from his fall substantially limit one or more major life activities, including, *inter alia*, walking, standing, sitting, lifting, bending, squatting, working, and undergoing jolting or impact.

60.     Thus, Connolly's injuries amount to disabilities.

61.     As a result, Connolly's doctor recommended that he avoid using stairs and lifting more than ten pounds, and further recommended that Connolly alternate between sitting and standing periodically.

62.     Additionally, Connolly's doctor recommended that he work remotely with the use of a standing desk and ergonomic chair.

63.     As a result of the injuries Connolly sustained from the aforementioned fall, Connolly took medical leave from in or around January 2018 through in or around December 2018.

**C.     Connolly's First Request for Reasonable Accommodations**

64.     In anticipation of his return to work and per the recommendation of his orthopedist, Connolly asked ACS to provide him with reasonable accommodations in or around November 2018.

65.     Specifically, Connolly requested: (i) that ACS provide and permit him to use a standing desk; (ii) permission to attend periodic physical therapy appointments using accrued paid time off; and (iii) permission to take breaks to walk around the office periodically.

66.     In December 2018, ACS granted Connolly's request for reasonable accommodations in its entirety.

**D.     Connolly's Heart Attack and Resulting Disabilities**

67.     In or around February 2019, Connolly suffered a myocardial infarction—known colloquially as a heart attack—caused by a decreased or complete cessation of blood flow to a portion of the myocardium in his heart.

68.     As a result of his heart attack, Connolly required several surgeries.

69.     First, while suffering or shortly after Connolly suffered his heart attack, a stent was inserted into one of his three major arteries.

70.     In 2020, Connolly underwent a second surgery—specifically, an angioplasty—during which another stent was inserted into a second main artery.

71.     In 2021, Connolly underwent a third surgery, during which a third stent was inserted into a third main artery.

72. As a result, Connolly now has stents in each of his three main arteries to maintain the functioning of his heart.

73. Finally, in 2022, Connolly underwent an angiogram due to continued chest pain.

74. Connolly's heart will not regenerate.

75. Further, Connolly is required to take two distinct heart medications, as well as other heart-related medications, and undergo periodic cardiac examinations for the rest of his life.

76. Connolly's permanent heart condition substantially limits one or more major life activities, including, *inter alia*, walking, standing, lifting, bending, squatting, working, and breathing.

77. Connolly's permanent heart condition also substantially limits one or more major bodily functions, including, *inter alia*, his respiratory and circulatory functions.

78. Thus, Connolly's heart condition amounts to a disability.

79. As a result of Connolly's heart condition, his doctor strongly advised and continues to advise strict stress management.

80. Specifically, Connolly's doctor recommended that Connolly be given a moderate case load of no more than 40 cases to keep Connolly's stress levels moderate, among other workplace accommodations.

E. **Connolly's Second Request for Reasonable Accommodations**

81. In or around March 2020, ACS began requiring employees to work remotely due to the COVID-19 pandemic.

82. In or around May 2021, ACS began requiring employees to report to work in person, even though the courts in which Connolly litigated were still handling appearances

remotely as a means to avoid congestion within courtrooms and thus limit the spread of COVID-19.

83. Connolly consulted with his orthopedist and cardiologist, both of whom recommended that he work remotely, in addition to recommending other workplace accommodations.

84. Accordingly, in or around February 2021, Connolly requested that ACS provide him with additional reasonable accommodations.

85. Specifically, Connolly requested that ACS provide him with the following reasonable accommodations, in addition to those already being provided (*see supra* ¶¶ 64-66): (i) a caseload of comprising a mix of certain types of cases Connolly would litigate directly, as well as others on which he would mentor more junior Agency Attorneys; (ii) additional time to complete assignments and travel (if and when travel became necessary); and (iii) permission to work remotely.

86. Notably, Connolly was already handling the same types of cases on which he asked ACS to staff him as a reasonable accommodation, which were squarely within the scope of his essential job functions.

87. Connolly also requested that ACS provide him with an ergonomic chair.

88. From the time of Connolly's request through in or around April 2021, Connolly and ACS engaged in an interactive process and cooperative dialogue to craft reasonable accommodations that would allow Connolly to perform the essential functions of his job.

89. Notably, during the interactive process and cooperative dialogue, Connolly suggested that ACS transfer him to at least four alternative, open positions; however, these requests were summarily rejected without any discussion.

90. As Connolly advised ACS, the transfer he requested was consistent with a reasonable accommodation ACS previously granted to a different Level III Agency Attorney within FCLS, who was transferred to a different position within ACS to reduce the Level III Agency Attorney's stress levels and thereby avoid exacerbating an existing disability.

91. To be clear, Connolly proposed a transfer merely as an alternative in the event ACS could not grant his request for the above-referenced reasonable accommodations.

92. It remained Connolly's preference to return to work as a Level III Agency Attorney within FCLS with reasonable accommodations.

93. Regardless, rather than transfer Connolly, ACS finally approved Connolly's reasonable accommodation request in or around April 2021.

94. Specifically, ACS granted Connolly the following reasonable accommodations: (i) a caseload of no more than 40 cases, comprising a mix of pre-fact finding abuse cases, pre-fact finding neglect cases, post-fact finding/disposition cases, post-disposition cases and permanency hearing cases; and (ii) additional time to complete assignments and travel (when necessary).

95. ACS proposed that Connolly be assigned 10 cases at first, and that ACS gradually increase his caseload thereafter up to a cap of 40 cases.

96. ACS also granted Connolly permission to work remotely.

97. Despite the Agency's policy to provide employees with ergonomic chairs for work purposes, ACS refused to provide Connolly with an ergonomic chair or a standing desk, as he had requested.

98. Accordingly, Connolly purchased these items on his own.

99. Nevertheless, Connolly accepted the Agency's proposed reasonable accommodations.

100.     ACS granted Connolly's reasonable accommodations for an indefinite time period, with no end date for the accommodations communicated to Connolly, provided that Connolly sent ACS regular updates from his doctors regarding the status of his disabilities and his continued need for reasonable accommodations.

101.     Throughout the relevant time period, Connolly consistently provided the requisite updates from his doctors through doctor's notes he regularly submitted to ACS.

## F.     Expansion of Connolly's Reasonable Accommodations to Account for Court Appearances

102.     In or around June 2022—at which point courts had begun to lift COVID-19-related restrictions on in-person appearances and increase the number of in-person appearances scheduled—Connolly sought clarification that he was permitted to make appearances remotely (in addition to working remotely, generally) under the existing reasonable accommodations for his disabilities.

103.     ACS granted Connolly's request within a few weeks, thereby confirming that he was permitted to make court appearances remotely.

104.     Connolly thereafter made remote courtroom appearances before several judges.

105.     Again, ACS granted Connolly's reasonable accommodations for an indefinite time period, with no end date for the accommodation communicated to Connolly.

## G.     Connolly Performs and Excels in His Essential Job Functions Following the Provision of Reasonable Accommodations

106.     From in or around April 2021 through in or around August 2022, Connolly's performance was stellar.

107.     By way of example, Deputy Borough Commissioner Evans, who served as Connolly's Unit Manager—and who assigned Connolly the majority of his cases, as well as

directly supervised the majority of Connolly's work—repeatedly praised Connolly during this time for his work product and efficient resolution of cases.

108.　　In fact, Connolly was so productive that he resolved his cases more quickly than ACS assigned them, resulting in his total caseload rarely if ever reaching the 40-case limitation agreed upon as part of his reasonable accommodations.

109.　　Additionally, it bears noting that, in or around December 2022, Evans informed Connolly that ACS had reduced the average caseload for Agency Attorneys throughout FCLS.

110.　　As such, as of December 2022, the average pre-fact finding caseload for Agency Attorneys was even closer to the 40-case cap agreed upon between Connolly and ACS than it had been when the Agency initially agreed to provide the accommodation in April 2021.

111.　　In short, over the course of well over one year (and in the case of the initial accommodations for Connolly's back, shoulder, knee, elbow, and hip injuries, roughly three years), Connolly excelled in all aspects of his work, and was certainly able to perform the essential functions of his job without issue.

112.　　Connolly had not given ACS any reason to believe that continuing to accommodate him would present an undue hardship of any kind.

## H.　　Connolly's Medical Leave for Further Cardiac Surgery

113.　　On or around August 19, 2022, Connolly requested medical leave to undergo an angiogram due to continued chest pain resulting from his January 2019 heart attack.

114.　　In connection with his request, Connolly completed and submitted to ACS a formal request for medical leave under the Family and Medical Leave Act.

115.　　ACS initially approved Connolly to take medical leave from August 22, 2022 through November 8, 2022, and later extended his leave through December 12, 2022.

116.    On or around October 18, 2022, ACS notified Connolly that, because he stopped working on August 19, 2022, the Agency would terminate his employment on August 18, 2023 unless he is able to return to work by that date.

117.    In a later email, ACS clarified that Connolly was not only required return to work by August 18, 2023, but had return to work "with no restrictions;" otherwise, ACS will terminate Connolly's employment.

## I.    ACS's Rescission of Connolly's Existing Reasonable Accommodations and Insistence that He Reapply for the Same

118.    On or around November 16, 2022, Connolly sent updated documentation from his doctor to Jessica Cooke ("Cooke"), an ADA Coordinator for ACS's Office of Equal Employment Opportunity ("OEEO"), with whom Connolly had previously communicated regarding his prior reasonable accommodation requests and ongoing medical leave.

119.    In reply, Connolly received an automated email notifying him that Cooke was no longer employed by ACS.

120.    Connolly then attempted to contact the Director and Deputy Director of OEEO, but was notified that, like Cooke, neither the Director nor Deputy Director was still employed by ACS.

121.    Connolly asked ACS to provide him with instructions and updated contact information so that he could submit his most recent medical documentation to the appropriate person.

122.    Connolly's email was ignored.

123.    Having still not received contact information for someone in OEEO who could confirm whether ACS would continue to provide him with reasonable accommodations ahead of his planned return to work on December 12, 2022, Connolly contacted Evans several times regarding the status of his request and engaging in an interactive process, but to no avail.

124.     Accordingly, on or around November 18, 2022, Connolly forwarded his medical documentation to Keys, ACS's EEO Officer at that time.

125.     In his email to Keys, Connolly again requested contact information for the ADA Coordinator who would be handling his case given that Cooke was no longer employed by ACS.

126.     Keys ignored Connolly's email.

127.     On or around November 30, 2022, Connolly emailed Keys yet again, but Keys again refused to respond.

128.     On or around December 5, 2022, Connolly spoke with Evans over the phone.

129.     During the conversation, Connolly explained that he had been unable to get in touch with anyone at OEEO regarding his reasonable accommodations and return to work, and wanted to speak with someone about his fast-approaching scheduled return date of December 12, 2022.

130.     Notably, Evans advised Connolly that the Office of Court Administration ("OCA") and judges had been honoring reasonable accommodations for attorneys who needed to appear remotely due to disabilities or other medical issues, including by permitting remote appearances.

131.     Within no more than 30 minutes of this conversation, Evans called Connolly back to confirm that ACS had lifted all reasonable accommodations that had previously been provided to Connolly.

132.     Further, Evans advised Connolly that his reasonable accommodations had been rescinded not because of OCA's or any judges' policies but, rather, pursuant to a new ACS directive to rescind all reasonable accommodations previously granted to Agency Attorneys.

133.     ACS had not spoken with Connolly about this previously—much less engaged in an interactive process.

134.    Shortly thereafter, ACS confirmed in writing that the Agency had, in fact, rescinded Connolly's reasonable accommodations, and directed Connolly to resubmit a new request for those same accommodations and provide updated medical documentation to support the same.

135.    Tellingly, ACS provided no rationale for its decision to rescind reasonable accommodations that were in place for an extended period.

136.    Specifically, the reasonable accommodations for Connolly's back, shoulder, knees, elbows, and hip injuries had been in place for over three years, and the further accommodations for Connolly's cardiac condition had been in place for more than one year and six months.

137.    Connolly complied, quickly gathering all necessary documents and submitting them to ACS within days.

138.    Specifically, Connolly provided medical documentation from both his orthopedist and his cardiologist, both of whom confirmed that Connolly was able to return to work on December 12, 2022 as scheduled, so long as ACS continued to provide him the same reasonable accommodations it had already agreed to provide in December 2018 and April 2021.

139.    On or around December 15, 2022, ACS asked Connolly for unspecified clarification regarding the recommendation of Connolly's cardiologist that he maintain a "moderate caseload" and "moderate stress level."

140.    This request for clarification was unnecessary—and as Connolly would soon learn, made purely as a means to unlawfully rescind reasonable accommodations that been previously approved.

141.    Indeed, Connolly's cardiologist had made the same recommendation previously in connection with Connolly's February 2021 reasonable accommodation request, after which

Connolly and ACS had already agreed upon restrictions to the number and types of cases he handled.

142.    Given that these restrictions were already in effect, had allowed Connolly to perform the essential functions of his job, and caused no undue hardship to ACS, there was no need for additional information from Connolly's cardiologist.

143.    Nevertheless, on or around December 20, 2022, Connolly submitted another letter from his cardiologist, which states as follows:

> I have been asked to expand on the terms 'moderate caseload' and 'moderate stress level' indicated in my December 6, 2022 letter. ***These recommendations were addressed in letters dating back to 2020***. Mr. Connolly['s] reports and documentation provided by Mr. Connolly show[] . . . that a recommended sustainable case caseload would be 50 to 60. Given Mr. Connolly's cardiac condition[,] less than the recommended 50 to 60 cases would be 'moderate' and accommodate his medical needs. Mr. Connolly reports that[,] ***in response to previous letters indicating a 'moderate caseload' and 'moderate stress level[,]' an agreement was reached with the employer that he maintain[] a 40[-]case caseload prior to his medical leave and such was manageable***. ***As such, this would be the recommended caseload***. Stress level, as in any and all situations, is dependent on the factors involved in the issue. ***Mr. Connolly reports that the type of cases that he was assigned prior to his leave were manageable***. ***As such, the same would be recommended***.

144.    In short, Connolly's cardiologist advised ACS, just as Connolly had himself, that Connolly was ready, willing, and able to return to work with the same reasonable accommodations that the Agency had already approved in December 2018 and April 2021.

145.    ACS never asked Connolly to obtain additional information from his cardiologist or even discussed the cardiologist's letter with him thereafter—and certainly did not engage in any genuine interactive process or cooperative dialogue regarding Connolly's reasonable accommodations and return to work.

**J.     ACS's Rescission of Connolly's Reasonable Accommodations**

146.     Approximately one hour after Connolly submitted the above-excerpted letter from his cardiologist—seemingly without even considering the contents of the same—ACS denied Connolly's request for reasonable accommodations.

147.     Specifically, in a form filled out by Keys, ACS claimed that granting Connolly the reasonable accommodations he had requested (and which had already been approved) would result in an unspecified "removal of essential functions" of his job and create a similarly unspecified "undue hardship" for the Agency.

148.     Conspicuously absent from the form is any mention of proposed alternative accommodations or any particularized statement as to the purported undue hardship or reasons why ACS could no longer provide Connolly the same accommodations that had been in place since December 2018 and April 2021, respectively.

149.     In a good faith effort to engage in an interactive process, Connolly emailed ACS to ask for clarification regarding the justifications, if any, for their denial of his request.

150.     Specifically, Connolly asked that ACS: (i) specify the supposed "undue hardship" his reasonable accommodations would create if granted; and (ii) explain what essential function of his job he could not perform with the requested accommodations.

151.     Further, Connolly asked if ACS could put a final decision regarding his request on hold, pending further visits with his orthopedist, cardiologist, and physical therapist scheduled for February 2023 (of which Connolly had previously advised the Agency).

152.     Determined (perhaps naïvely) to engage in a genuine interactive process and arrive at reasonable accommodations that would be workable for both sides, Connolly proposed

alternative, less accommodations regarding remote work and his caseload, and invited ACS to make its own proposals.

153.    Apparently unwilling to meet their obligation to engage in a good-faith interactive process, ACS characteristically ignored Connolly's email.

154.    In a separate email, ACS replied further: "You will remain on a medical leave until either your Physician indicates that you no longer require restrictions or your condition improves where you are able to return to work with no restrictions."

155.    In other words, ACS was unwilling to consider any accommodations of any kind and refused to continue to employ Connolly as long as he continued to suffer from disabilities.

156.    Notably, on or around January 23, 2023, Connolly's immediate supervisor, John Maggio, made an office-wide request for assistance with drafting intake petitions; i.e., one of the exact types of matters Connolly proposed he handle during his 2021 interactive process with ACS, and could have handled had ACS allowed Connolly to resume his work functions under the previously granted reasonable accommodations.

157.    It also bears noting that ACS has granted similar accommodations—including permission to work remotely—to other Agency Attorneys while denying Connolly the same reasonable accommodation.

158.    Indeed, an attorney who reports directly to Evans works remotely, despite the Agency's refusal to continue affording Connolly the same as a reasonable accommodation.

159.    Moreover, Connolly is aware of an Agency Attorney within FCLS who has been working remotely as recently as January 2023—i.e., the same month in which ACS denied Connolly's reasonable accommodation—if not later.

160.    Lastly, as noted above, ACS previously accommodated a different Level III Agency Attorney within FCLS by transferring the Level III Agency Attorney to a different position within ACS to reduce stress levels and thereby avoid exacerbating an existing disability.

**K.    Connolly's Appeal and ACS's Baseless Denial of the Same**

161.    On or around January 13, 2023, Connolly submitted a timely appeal of ACS's December 20, 2022 decision to rescind his reasonable accommodations.

162.    On or around February 15, 2023, ACS denied Connolly's appeal, offering only the same broad, conclusory language that—despite Connolly's receipt of the same accommodations in December 2018 and April 2021, respectively (*see supra* ¶¶ 64-66, 94-105), and his subsequent ability to carry out his job duties without issue—accommodating Connolly would somehow cause an unspecified "undue hardship and would require the removal of an essential job function."

163.    Since the denial of his appeal and through the present, Connolly has continued to ask for clarification regarding the supposed "undue hardship" related to his rescinded reasonable accommodations and an explanation as to what essential function of his job he could not perform with the requested accommodations.

164.    Connolly even filed a renewed request for the previously approved accommodations to be reinstated.

165.    In denying Connolly's renewed request, ACS simply repeated their unsupported and unexplained claims of undue hardship and assertion that the accommodations would prevent Connolly from performing the essential functions of his job.

166.    Even though Connolly timely appealed ACS's decision and asserted detailed factual allegations nearly identical to the allegations asserted here, ACS again denied Connolly's appeal by simply repeating the baseless justifications noted above.

**L.** **Damages to Connolly Caused by ACS's Rescission of His Reasonable Accommodations, and ACS's Refusal to Consider Connolly for Other Positions within the Agency**

167.   In a further effort to work cooperatively and proactively with ACS to return to work, Connolly applied to several other positions within ACS, including, inter alia, Legal Counsel Unit Agency Attorney, Fair Hearings & Compliance Unit Agency Attorney, and Reasonable Accommodations Specialist.

168.   Each of Connolly's applications was denied without interview and, upon information and belief, without genuine consideration of his candidacy.

169.   Moreover, after ACS rescinded his reasonable accommodations, Connolly asked ACS what would happen if he were unable to return to work by August 18, 2023.

170.   ACS confirmed that, if Connolly did not return to work by August 18, 2023, ACS would terminate his employment.

171.   This was gravely concerning to Connolly, as a termination of his employment—despite the fact that he was ready, willing, and able to work with the reasonable accommodations previously provided to him—would have resulted not only in the loss of his job, but also caused him to forfeit pension benefits he has earned over the course of more than two decades at ACS.

172.   While Connolly could have preserved his pension benefits by retiring, he has no desire to retire or otherwise end his employment at ACS.

173.   Moreover, retiring would have caused Connolly to lose considerable pension benefits that he will vest upon his retirement, and which gradually increase the longer he works at ACS.

174.   For example, if Connolly retires now, he will lose approximately $10,000 in annual pension benefits he will receive if he retires at the age of 62, rather than at his current age of 58.

175.    Further, while Connolly received his full salary from December 2022 through August 28, 2023, he was only able to do so by using banked compensatory time, valued at approximately $5,600 per month.

176.    Connolly would not have needed to expend this compensatory time had ACS permitted him to return to work with the same reasonable accommodations under which he had been working since December 2018 and April 2021, respectively.

177.    Lastly, if ACS fires Connolly, he will lose medical benefits that he needs to address his life-threatening cardiac condition, including, *inter alia*, coverage for the cost of medications he needs to live and which he will not be able to afford without health insurance.

**M.    ACS Mandates that Connolly Remain Out on Medical Leave Even After He Was Cleared to Return to Work Without Accommodations**

178.    On June 5, 2023, Connolly provided ACS with a letter from his orthopedist stating that he could return to work without accommodations.

179.    Similarly, on August 2, 2023, Connolly provided ACS with a letter from his cardiologist stating that he could return to work without restrictions.

180.    Connolly's physicians accounted for the possibility that he might need accommodations in the future and scheduled him to attend regular reevaluations, especially considering his permanent heart condition and the physical and mental stress related to his return to work.

181.    Incredibly, in response, ACS claimed that the letter from Connolly's cardiologist somehow "insufficient" to clear him to return to work and mandated that he maintain out on medical leave "[a]bsent a more clear and definitive doctor's note[.]"

182.    Although the letter from Connolly's cardiologist was more than sufficient and similar to other letters ACS had previously accepted, Connolly provided ACS with a second note

from his cardiologist stating in part "Mr. Delano Connolly was seen in my office on 8/2/2023. He has been under my care since 3/10/2023. *He is currently medically stable to return to work*."

183.    However, ACS refused to allow Connolly to return to work and continued to claim that the original cardiologist letter was inadequate.

## N.    ACS is Prohibited from Terminating Connolly's Employment to Prevent Him from Suffering Irreparable Harm

184.    On April 28, 2023, Connolly filed the State Court Action to contest ACS's unlawful decision to rescind reasonable accommodations. *See Delano Connolly v. New York City Administration for Children's Services, et al.*, Index No. 512787/2023 (New York State Court, Kings County) (the "State Court Action").

185.    By refusing to allow Connolly to return from medical leave despite him being cleared by his doctors to return without restrictions, ACS caused a situation where Connolly faced suffering irreparable harm in connection with the Agency's planned termination of his employment on August 18, 2023.

186.    As mentioned above, ACS's scheduled termination of Connolly's employment would have resulted in lost medical benefits that he needs to address his life-threatening cardiac condition, including, inter alia, coverage for the cost of medications that he would not be able to afford without health insurance.

187.    Facing irreparable harm, Connolly filed an application for a temporary restraining order and preliminary injunction preventing ACS from terminating his employment or health benefits during the pendency of the State Court Action.

188.    Connolly's application was granted, and ACS is currently enjoined from terminating Connolly's employment.

**O.** **Connolly Returns to Work and ACS Launches a Campaign of Discrimination and Retaliation Against Him**

189. After ACS's plan to terminate Connolly was frustrated, Connolly returned to work on August 28, 2023.

190. Immediately thereafter, ACS persisted in its efforts to end Connolly's employment in a clear effort to circumvent the injunctive relief awarded in the State Court Action.

191. Specifically, on Connolly's first day back at work following his return from forced medical leave, Evans and Borough Commissioner Nembhard called Connolly into a meeting and asked him if he was planning to retire.

192. Before Connolly could answer, Nembhard pressed Connolly on whether he was medically able to return to work even though Connolly had provided letters from his doctors clearing him to return to work without accommodations.

193. Evans then pressed Connolly on whether he could handle the stress of being an attorney at ACS.

194. Next, in a clear attempt to intimidate Connolly, Nembhard told Connolly about another ACS employee who allegedly experienced a medical episode at work and had to be carried out on a stretcher.

195. Despite Nembhard and Evans's efforts to force him to retire, Connolly told them that he had no plans to retire and would continue working at ACS.

196. After their initial efforts to force Connolly out of ACS failed, Evans and Nembhard initiated a campaign of discrimination and retaliation against Connolly aimed at making his working conditions so unbearable that he would be forced to retire or resign.

197. On September 22, 2023, in response to Evans and Nembhard's discriminatory and retaliatory treatment of him, Connolly complained about their unlawful conduct in an email to Roseborough, ACS's Assistant Commissioner, Human Resources Operations.

198. Specifically, Connolly complained that he was being discriminated against because he suffers from disabilities and retaliated against for engaging in protected activities, including the filing of the State Court Action.

199. In his email, Connolly highlighted some of the discriminatory and retaliatory conduct he has been subjected to by ACS, Evans, and Nembhard:

- Since returning from leave, Connolly has been assigned to work on intake cases two days per week starting around 12:30 p.m., which interferes with Connolly's lunch period and his ability to take necessary mediations related to his disabilities which must be taken with food.

- Nembhard refuses to speak with Connolly about reasonable accommodations even though he is one of Connolly's supervisors and ACS's EEO policy states that an employee should "[s]peak to a supervisor or a manager or an agency EEO representative."

- In stark contrast to previous EEO leadership suggesting a gradual increase Connolly's workload in connection with a prior return from medical leave in April 2021, ACS immediately assigned Connolly to 34 cases after returning from medical leave in August 2023. Several of the cases assigned to Connolly had appearances on the date of assignment, leaving Connolly with little to no time to adequately review cases files and learn about the cases. ACS even assigned Connolly to six cases right before he was scheduled to take a scheduled leave. Based on Connolly's experience working for over two decades at ACS, the manner in which he has been assigned cases since his return from medical leave is highly irregular, different from how he was assigned cases prior to his medical leave, and different from how cases are assigned to his colleagues who do not suffer from disabilities.

- ACS has a policy of providing attorneys with overtime pay for any hours worked over the required 35 hours attorneys are expected to work each week. Under ACS's policy, attorneys can be compensated with additional wages or paid time off. Because of the demanding caseload ACS assigned to Connolly after he returned from medical leave, in October 2023, Connolly put in for 13 hours of overtime time through ACS's computer systems. However, Evans denied Connolly's request even though he previously approved similar requests by Connolly before he returned from medical leave. Also, through conversations with other attorneys at

26

ACS since returning from medical leave, Connolly is aware that similar requests by other attorneys who do not suffer from disabilities are regularly approved. Additionally, Connolly spoke with payroll employees who told him that Evans initially approved Connolly's request for overtime pay but abruptly rescinded the approval soon after Connolly first inquired about the status of his request.

- Evans has withheld relevant information from Connolly about cases that have been transferred to him which has made it more difficult for Connolly to perform his work. For example, on August 29, 2023, his second day back from medical leave, Connolly emailed Evans a question about a case Evans had transferred to him. Specifically, Connolly asked if case was on for an imminent risk hearing, which is an emergency hearing in family court related to the safety of a child schedule to be returned to the custody of a parent. Evans never responded to Connolly's email.

- At ACS, attorneys are provided with a fulltime paralegal to assist them with their cases. On August 31, 2023, Connolly was informed that he was only provisionally assigned a paralegal after returning from medical leave. Connolly was not provided a fulltime paralegal until weeks after he returned from medical leave. However, Alicia Walton ("Walton"), the paralegal supervisor, instructed the paralegal assigned to Connolly to complete all assignments Walton gave to her before assisting Connolly with his cases. Based on Connolly's experience and his conversations with colleagues, all other attorneys within the Brooklyn FCLS office have permanent paralegals assigned to them and those paralegals do not have to complete assignments from Walton prior to addressing the legal assignments given to them by attorneys.

- In the Brooklyn FCLS office, all attorneys are given a permanent assignment to a specific team. On September 7, 2023, Connolly asked Nembhard why had not yet been assigned to a team. Nembhard responded that Connolly was "temporarily" assigned to Deputy Borough Commissioner Jennifer Baum's team. To date, ACS still has not permanently assigned Connolly to a team. Connolly is not aware of any other attorneys in the Brooklyn office who have temporary team assignments.

- On September 7, 2023, Evans transferred several cases to Connolly with deadlines to file subpoenas and motions by September 22, 2023. Evans transferred these cases to Connolly knowing that Connolly was assigned to draft cases on September 8 and would not be able to review the cases until September 9 at the earliest. Evans was also aware that Connolly was scheduled to be out of the office from September 11, 2023 through September 18, 2023. Clearly, Evans was attempting to set Connolly up to fail by creating situations ACS could use to claim Connolly was a poor performer.

- On September 8, 2023, Evans refused to grant a request by Connolly for vacation time around Thanksgiving and Christmas. Evans claimed that Connolly's request was "under review" and that he would decide on the request at a "later date." Evans attempted to justify his refusal to grant the requested vacation time by claiming that

he needed to "assess the needs of the office." However, prior to his medical leave, Connolly was never denied requests for vacation time around the holidays. Also, there are historically very few cases that are filed in November and December and many cases are adjourned until January. The refusal to grant Connolly's request for vacation time was particularly callous since Evans was aware that November 22, 2023 is Connolly's late-mother's birthday and that he was taking off to honor and remember his mother.

200. Despite Connolly repeatedly following up concerning his complaints of discrimination, to date, ACS has not done anything to address Connolly's complaints.

201. Rather, in a blatant act of retaliation against Connolly for filing a Charge of Discrimination with the EEOC on December 22, 2023 and engaging in other protected activities, ACS refused to investigate or do anything to address Connolly's complaints.

202. Indeed, in response to Connolly's September 22, 2023 email referenced above, Garcia, stated, "In regard to the allegations contained in your email to Assistant Commissioner Siheem Roseborough dated September 22, 2023, which we indicated we would look into, please note that OEEO will discontinue further exploration, as said allegations were also raised in your external filing and will be addressed by ACS in response to said filing."

**P.**     **Connolly's Third Request Reasonable Accommodations After Symptoms of His Disabilities Increase After Returning to Work**

203. On September 14, 2023, Connolly attended a physical examination of his hip, back, and shoulder by his orthopedist Howard I. Baum, M.D. ("Dr. Baum") in connection with his disabilities resulting from the January 2018 fall he suffered at work.

204. During the examination, Dr. Baum determined that Connolly's return to work without accommodations caused a flare up of the symptoms of his disabilities which caused Connolly to suffer from considerable pain.

205.    As a result, Dr. Baum recommended that ACS provide Connolly with a hybrid telework accommodation so he could work from home a few days a week until he could be reevaluated.

206.    That same day, Connolly put in a request for reasonable accommodation to be able to work from home two days per week.

207.    On October 5, 2023, Connolly was examined by another orthopedist William Lackey, M.D ("Dr. Lackey").

208.    As a result of the examination, Dr. Lackey determined that knee, elbow, back, neck, shoulder, and hip pain Connolly had been experiencing was related to the disabilities he suffers from as a result of the fall he experienced in January 2018.

209.    To alleviate the pain Connolly was experiencing and to treat the symptoms of his disabilities, Dr. Lackey recommended that Connolly work two days per week at home because "it is difficult for [Connolly] to ambulate and travel."

210.    On October 10, 2023, Connolly submitted a letter from Dr. Lackey to Shalini Shalini, a EEO Consultant at ACS, in further support of his request for a reasonable accommodation.

211.    Despite the incredible pain Connolly was experiencing, the obvious need to address his request for accommodations as soon as possible, and repeated follow-up emails from Connolly concerning the status of his request, Garcia, ACS's EEO Investigator, did not issue a determination on Connolly's request until October 18, 2023.

212.    Following ACS's playbook of rubberstamping denials of requests for reasonable accommodations without any justification, Garcia claimed that providing Connolly with the

requested hybrid work schedule would somehow prevent him from performing the essential functions of his job and cause ACS an undue hardship.

213.    However, similar to the determinations ACS issued denying Connolly's other requests for reasonable accommodations, the determination prepared by Garcia did not explain how Connolly supposedly could not perform the essential functions of his job with the remote work accommodation or how it would cause ACS to suffer an undue hardship.

214.    Also, ACS did not engage in an interactive process with Connolly concerning his request.

215.    Days after denying Connolly's request, ACS launched a hybrid work program which "afford[s] eligible employees the opportunity to fulfill their work responsibilities from an alternative location, such as their home, for one or two days per week on a fixed schedule."

216.    ACS admits that "Hybrid work allows employees to perform their job duties from an approved alternate location outside the traditional office setting and to promote flexibility, increase productivity, and enhance work-life balance while supporting the mission of ACS."

217.    Participation in hybrid work program determined based on several factors, including "job roles and responsibilities and operational necessity within ACS[,]" "a recorded and proven track record of satisfactory or higher (a performance evaluation rating of 3 or higher) performance history[.]"

218.    ACS admits that "[their] records indicate that [Connolly is] currently an eligible member of CSBA approved to participate in the ACS Hybrid Work program pilot."

219.    Clearly, ACS's denial of Connolly's request for a hybrid telework accommodation had absolutely nothing to do with any supposed inability to perform the essential functions of his job or any alleged undue hardship on ACS.

220.     Indeed, Connolly repeatedly requested that ACS provide an explanation in support of its determination to deny his request for a hybrid telework accommodation.

221.     For example, on November 7, 2023, Connolly sent an email to Garcia, an EEO Investigator at ACS, Keys, and Roseborough asking, *inter alia*, how the hybrid telework accommodation he requested would cause an undue hardship and prevent him from performing the essential functions of his job.

222.     Attached to his email and in support of his request, Connolly provided letters from Dr. Baum and Dr. Charles Funfaro, his Chiropractor.

223.     In his letter, Dr. Baum stated that he examined Connolly on October 19, 2023 and determined that he was suffering from pain in his right and left hips, back, and along his spine in connection with disabilities he suffers from a result of his fall at work in January 2018.

224.     As a result, Dr. Baum recommended that Connolly work a "hybrid work schedule with some days work[ing] from home for at least next days[] to limit travel impact on areas [where Connolly was experiencing pain."

225.     Dr. Funfaro's letter stated:

> The patient is partially disabled, but is working a full schedule.  The patient finds it difficult to commute to work 5 days weekly and maintain his full work schedule due to increased pain in his neck and back as well as chronic occipital headache.  This makes it difficult for him to concentrate.  The above[-]referenced injuries are compounded by his shoulder and hip joint problems making it extremely difficult for him to commute with mass transit.  These injuries appear permanent in nature.  As the patient wishes to continue working, a reasonable compromise would be a hybrid work schedule with the patient working from home 2 to 3 days weekly for the next 3 months.

226.     Incredibly, even though Connolly provided the above letters to Garcia, Keys, and Roseborough, and ACS had already approved Connolly to participate in ACS's hybrid work

program, neither Garcia, Keys, Roseborough, or anyone else at ACS has responded to Connolly's email.

**Q.** **ACS Approves Connolly's Fourth Request for Reasonable Accommodations**

227.     On May 1, 2024, after symptoms of his disabilities continued to worsen, Connolly requested the following reasonable accommodations:  (i) work remotely three days per week, (ii) flexibility to decide on which days he will work remotely, (iii) permission to take periodic breaks and walk around the office to help alleviate pain resulting from his disabilities, (iv) leave to attend medical appointments related to his disabilities, and (v) an ergonomic chair to help alleviate pain resulting from his disabilities.

228.     Notably, the above-referenced accommodations are virtually identical to the reasonable accommodations ACS took away from Connolly in December 2022 and the ones that ACS denied Connolly in connection with his requests for accommodations following the Agency rescinding his previously approved accommodations.

229.     Rather than summarily deny Connolly's request, under the leadership of Joanna Rose, ACS's new EEO Officer, ACS granted Connolly's request even though the Agency previously determined that such accommodations would cause ACS an undue hardship and prevent Connolly from performing the essential functions of her job.

**FIRST CAUSE OF ACTION**
**VIOLATIONS OF THE ADA: DISCRIMINATION**
(*Against Defendants ACS and the City of New York*)

230.     Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

231.     During the full statutory period, Plaintiff was protected by the provisions of the American with Disabilities Act, 42 U.S.C.A. § 12101, *et seq.*, and all applicable regulations thereunder.

232.     During the full statutory period, ACS and the City were subject to the provisions of the American with Disabilities Act, 42 U.S.C.A. § 12101, *et seq.*, and all applicable regulations thereunder.

233.     As set forth above, ACS and the City discriminated against Plaintiff on the basis of his disabilities in violation of the ADA, by, *inter alia*, denying him equal terms and conditions of employment because of his disabilities, rescinding his reasonable accommodations and refusing to reinstate same, and failing to engage in an interactive process.

234.     ACS and the City's unlawful and discriminatory actions were intentional, done with malice, and showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the ADA.

235.     As a direct and proximate result of ACS and the City's unlawful and discriminatory conduct in violation of the ADA, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted by law.

236.     Plaintiff is further entitled to an award of reasonable attorneys' fees and costs.

<u>**SECOND CAUSE OF ACTION**</u>
<u>**VIOLATIONS OF THE ADA: RETALIATION**</u>
(*Against Defendants ACS and the City of New York*)

237.     Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

238. During the full statutory period, Plaintiff was protected by the provisions of the American with Disabilities Act, 42 U.S.C.A. § 12101, *et seq.*, and all applicable regulations thereunder.

239. During the full statutory period, ACS and the City were subject to the provisions of the American with Disabilities Act, 42 U.S.C.A. § 12101, *et seq.*, and all applicable regulations thereunder.

240. As set forth above, Plaintiff engaged in protected activities by, *inter alia*, requesting reasonable accommodations related to his disabilities, lodging complaints of disability discrimination, filing the State Court Action, and filing a Charge of Discrimination with the EEOC.

241. ACS and the City retaliated against Plaintiff for his protected activities in violation of the ADA by, *inter alia*, rescinding his previously approved accommodations and refusing to reinstate same, denying his requests for reasonable accommodations, and failing to engage in the interactive process related to his requests for reasonable accommodations.

242. ACS and the City's unlawful and retaliatory actions were intentional, done with malice, and showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the ADA.

243. As a direct and proximate result of ACS and the City's unlawful and retaliatory conduct in violation of the ADA, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted by law.

244. Plaintiff is further entitled to an award of reasonable attorneys' fees and costs.

## THIRD CAUSE OF ACTION
## VIOLATIONS OF THE NYSHRL: DISCRIMINATION
*(Against All Defendants)*

245. Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

246. During the full statutory period, Plaintiff was protected by the provisions of the NYSHRL, N.Y. Exec. Law §§ 290, *et seq.*, and all applicable regulations thereunder.

247. During the full statutory period, Defendants were subject to the provisions of the NYSHRL, N.Y. Exec. Law §§ 290, *et seq.*, and all applicable regulations thereunder.

248. As set forth above, Defendants discriminated against Plaintiff on the basis of her disabilities in violation of the NYSHRL, by, *inter alia*, denying him equal terms and conditions of employment because of his disabilities, rescinding his reasonable accommodations and refusing to reinstate same, and failing to engage in an interactive process.

249. Defendants' unlawful and discriminatory actions were intentional, done with malice, and showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYSHRL.

250. As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted by law.

251. Plaintiff is further entitled to an award of reasonable attorneys' fees and costs.

## FOURTH CAUSE OF ACTION
## VIOLATIONS OF THE NYSHRL: RETALIATION
*(Against All Defendants)*

252. Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

253.    During the full statutory period, Plaintiff was protected by the provisions of NYSHRL, N.Y. Exec. Law §§ 290, *et seq.*, and all applicable regulations thereunder.

254.    During the full statutory period, Defendants were subject to the provisions of NYSHRL, N.Y. Exec. Law §§ 290, *et seq.*, and all applicable regulations thereunder.

255.    As set forth above, Plaintiff engaged in protected activities by, *inter alia*, requesting reasonable accommodations related to his disabilities, lodging complaints of disability discrimination, filing the State Court Action, and filing a Charge of Discrimination with the EEOC.

256.    Defendants retaliated against Plaintiff for her protected activities in violation of the NYSHRL by, *inter alia*, rescinding his previously approved accommodations and refusing to reinstate same, denying his requests for reasonable accommodations, and failing to engage in the interactive process related to his requests for reasonable accommodations.

257.    Defendants' unlawful and retaliatory actions were intentional, done with malice, and showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYSHRL.

258.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages to the greatest extent permitted by law.

259.    Plaintiff is further entitled to an award of reasonable attorneys' fees and costs.

**FIFTH CAUSE OF ACTION**
**VIOLATIONS OF THE NYSHRL: AIDING AND ABETTING**
(*Against Defendants Evans, Keys, Nembhard, Garcia, and Roseborough*)

260.    Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

261. During the full statutory period, Plaintiff was protected by the provisions of NYSHRL, N.Y. Exec. Law §§ 290, *et seq.*, and all applicable regulations thereunder.

262. During the full statutory period, Defendants Evans, Keys, Nembhard, Garcia, and Roseborough were subject to the provisions of NYSHRL, N.Y. Exec. Law §§ 290, *et seq.*, and all applicable regulations thereunder.

263. Defendants Evans, Keys, Nembhard, Garcia, and Roseborough knowingly aided and abetted the unlawful employment practices, discrimination and retaliation against Plaintiff in violation of the NYSHRL by, *inter alia*, denying her equal terms and conditions of employment because of her disability, supporting ACS's decision to rescind Plaintiff's previously approved reasonable accommodations and deny reinstatement of same, supporting ACS's decisions to deny Plaintiff's requests for reasonable accommodations, and supporting ACS's refusal to engage in the interactive process related to his requests for reasonable accommodations.

264. Defendants Evans, Keys, Nembhard, Garcia, and Roseborough's unlawful conduct was intentional, done with malice, and showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYSHRL.

265. As a direct and proximate result of Defendants Evans, Keys, Nembhard, Garcia, and Roseborough's unlawful conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of damages to the greatest extent permitted by law.

266. Plaintiff is further entitled to an award of reasonable attorneys' fees and costs.

## EIGHTH CAUSE OF ACTION
## VIOLATIONS OF THE NYCHRL: DISCRIMINATION
(*Against All Defendants*)

267.    Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

268.    During the full statutory period, Plaintiff was protected by the provisions of the NYCHRL, N.Y.C. Admin. Code §§ 8-101, *et seq.*, and all applicable regulations thereunder.

269.    During the full statutory period, Defendants were subject to the provisions of the NYCHRL, N.Y.C. Admin. Code §§ 8-101, *et seq.*, and all applicable regulations thereunder.

270.    As set forth above, Defendants discriminated against Plaintiff on the basis of his disabilities in violation of the NYCHRL, by, *inter alia*, denying him equal terms and conditions of employment because of his disabilities, rescinding his reasonable accommodations and refusing to reinstate same, and failing to engage in an interactive process.

271.    Defendants' unlawful and discriminatory actions were intentional, done with malice, and showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYCHRL.

272.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of damages to the greatest extent permitted by law.

273.    Plaintiff is further entitled to an award of reasonable attorneys' fees and costs.

## NINTH CAUSE OF ACTION
## VIOLATIONS OF THE NYCHRL: RETALIATION
(*Against All Defendants*)

274.    Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

275. During the full statutory period, Plaintiff was protected by the provisions of NYCHRL, N.Y.C. Admin. Code §§ 8-101, *et seq.*, and all applicable regulations thereunder.

276. During the full statutory period, Defendants were subject to the provisions of NYCHRL, N.Y.C. Admin. Code §§ 8-101, *et seq.*, and all applicable regulations thereunder.

277. As set forth above, Plaintiff engaged in protected activities by, *inter alia*, requesting reasonable accommodations related to his disabilities, lodging complaints of disability discrimination, filing the State Court Action, and filing a Charge of Discrimination with the EEOC.

278. Defendants retaliated against Plaintiff for her protected activities in violation of the NYCHRL by, *inter alia*, rescinding his previously approved accommodations and refusing to reinstate same, denying his requests for reasonable accommodations, and failing to engage in the interactive process related to his requests for reasonable accommodations.

279. Defendants' unlawful and retaliatory actions were intentional, done with malice, and showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYCHRL.

280. As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of damages to the greatest extent permitted by law.

281. Plaintiff is further entitled to an award of reasonable attorneys' fees and costs.

### TENTH CAUSE OF ACTION
### VIOLATIONS OF THE NYCHRL: AIDING AND ABETTING
(*Against Defendants Evans, Keys, Nembhard, Garcia, and Roseborough*)

282. Plaintiff hereby repeats and realleges the foregoing allegations as if set forth fully herein.

283. During the full statutory period, Plaintiff was protected by the provisions of NYCHRL, N.Y.C. Admin. Code §§ 8-101, et seq., and all applicable regulations thereunder.

284. During the full statutory period, Defendants Evans, Keys, Nembhard, Garcia, and Roseborough were subject to the provisions of NYCHRL, N.Y.C. Admin. Code §§ 8-101, et seq., and all applicable regulations thereunder.

285. Defendants Evans, Keys, Nembhard, Garcia, and Roseborough knowingly aided and abetted the unlawful employment practices, discrimination and retaliation against Plaintiff in violation of the NYSHRL by, *inter alia*, denying her equal terms and conditions of employment because of her disability, denying her equal terms and conditions of employment because of her disability, supporting ACS's decision to rescind Plaintiff's previously approved reasonable accommodations and deny reinstatement of same, supporting ACS's decisions to deny Plaintiff's requests for reasonable accommodations, and supporting ACS's refusal to engage in the interactive process related to his requests for reasonable accommodations.

286. Defendants Evans, Keys, Nembhard, Garcia, and Roseborough's unlawful conduct was intentional, done with malice, and showed a deliberate, willful, wanton, and reckless indifference to Plaintiff's rights under the NYSHRL.

287. As a direct and proximate result of Defendants Evans, Keys, Nembhard, Garcia, and Roseborough's unlawful conduct in violation of the NYSHRL, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of damages to the greatest extent permitted by law.

288. Plaintiff is further entitled to an award of reasonable attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself, respectfully requests that this Court:

A.     Declare that the practices complained of herein are unlawful under applicable State and City law;

B.     Grant an injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.     Grant Plaintiff an award of damages, in an amount to be determined after a trial, to compensate him for all non-monetary and/or compensatory damages she has suffered, including, *inter alia*, compensation for his mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and emotional distress;

D.     Grant Plaintiff an award of damages, in an amount to be determined after a trial, for any and all other monetary and/or non-monetary losses he has suffered;

E.     Grant Plaintiff an award of prejudgment interest on the damages he is awarded to the greatest extent permitted by law;

F.     Grant Plaintiff an award of punitive damages in an amount to be determined after a trial;

G.     Grant Plaintiff an award of reasonable attorneys' fees to the greatest extent permitted by law;

H.     Award Plaintiff her reasonable attorneys' fees and costs and disbursements in this action including, without limitation, any accountants' or experts' fees; and

I.     Grant Plaintiff such other and further relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues of fact and damages.

Dated: August 7, 2024
        New York, New York

**CRABILL PLLC**

By: _/s/ Taylor J. Crabill_____
       Taylor J. Crabill

71-01 Austin Street
Forest Hills, New York 11375
Tel: 727-335-1030
tcrabill@crabilllawfirm.com

*Attorney for Plaintiff*